# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0134-22

STATE IN THE INTEREST
OF M.P., a juvenile.[1]

_____

APPROVED FOR PUBLICATION

September 4, 2024

APPELLATE DIVISION

Argued May 29, 2024 – Decided September 4, 2024

Before Judges Sumners, Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey,
Chancery Division, Family Part, Middlesex County,
Docket No. FJ-12-0333-22.

Luke C. Kurzawa argued the cause for appellant M.P.
(Reisig Criminal Defense & DWI Law, LLC,
attorneys; Luke C. Kurzawa, on the brief).

Joseph Jakuback, Assistant Prosecutor, argued the
cause for respondent State of New Jersey (Yolanda
Ciccone, Middlesex County Prosecutor, attorney;
Joseph Jakuback, of counsel and on the brief).

The opinion of the court was delivered by

SUMNERS, C.J.A.D.

In this appeal, we are asked to reconsider our decision in State in the

Interest of K.B., 304 N.J. Super. 628 (App. Div. 1997), where we held that

juveniles adjudicated delinquent who seek nondisclosure of their name must

---

[1] We use initials to protect the confidentiality of the juvenile.  R. 1:38-3(d)(5).

demonstrate harm specific to their individual circumstances. Juvenile M.P. contends due to the public disclosure of his juvenile delinquency adjudication and name over the Internet, he suffers far greater harm than the juvenile in K.B. faced some twenty-seven years ago, when online news reporting was nascent. He contends he "demonstrate[d] a substantial likelihood that specific and extraordinary harm would result from such disclosure," the standard under N.J.S.A. 2A:4A-60(f) to bar disclosure. Given that K.B. was based upon our interpretation of N.J.S.A. 2A:4A-60(f), a statute which still governs the disclosure of a juvenile delinquency adjudication and has not been amended to reflect the Internet's impact, we affirm the trial court's order because M.P. failed to show how disclosure of his name would violate the statute.

I

M.P. was sixteen years old when he was arrested for taking a loaded handgun to school. There was no allegation he threatened or harmed anyone with the gun. Per a negotiated plea agreement, he later pled guilty to an offense which, if committed by an adult, would constitute second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1). The State agreed to recommend M.P. receive a thirty-day sentence in juvenile detention with two years' probation and dismissal of the remaining weapons charges.

Before going on the record at the disposition hearing, defense counsel advised the prosecutor he would seek an order "to prevent disclosure under [N.J.S.A. 2A:4A-60(f)]." However, defense counsel mistakenly referred to this process as seeking "to seal the record." Not realizing defense counsel's intended meaning, the prosecutor replied, "that's not necessary. It's already under seal." The judge, overhearing this exchange, agreed with the prosecutor. Relying on that discussion, defense counsel did not request M.P.'s name be withheld from the public once the court went on the record. The judge sentenced M.P. to two years' probation but deviated from the plea agreement by not placing him in juvenile detention for thirty days.

Two weeks later, the Middlesex County Prosecutor's Office (MCPO) issued a press release on its website detailing M.P.'s name, school, hometown, offense, and disposition.[2] Consequently, there were more than ten articles[3] published on the Internet by multiple media outlets reporting M.P.'s delinquency and his name. For reasons that are undisclosed in the record, the MCPO removed the press release from its website six days later after M.P.

---

[2] The press release incorrectly claimed the State sought two years' incarceration.

[3] The record before us does not include the articles. During the trial court's hearing, defense counsel represented M.P. was named in nine articles by New Jersey-based media outlets and additional articles on other platforms from "all over the country."

3                                                                    A-0134-22

notified the trial court. The court conducted a hearing to determine whether disclosing M.P.'s identity and the adjudication to the public violated N.J.S.A. 2A:4A-60(f) by causing him "substantial likelihood" of "specific and extraordinary harm." At the hearing, M.P. asserted the court should order his name be withheld from the public and the reporting media outlets "delete" his name from their published articles.

In its written decision denying M.P. relief, the trial court applied the standard we set forth in K.B., 304 N.J. Super. at 634, requiring that a juvenile found to be delinquent who seeks nondisclosure of their name must demonstrate harm specific to their individual circumstances. The court was unpersuaded by M.P.'s contention that disclosure of his name "branded [him] as the individual who brought a loaded handgun to a public high school," which would damage his employment and college admissions prospects. The court found M.P.'s concerns were reasonable consequences borne by all juveniles adjudicated of committing serious offenses. It dismissed M.P.'s attempt to distinguish K.B. by claiming the decision was obsolete due to the expansive growth of the Internet since the decision, observing the requirement of harm specific "to the juvenile remains . . . static."

A-0134-22

M.P. appealed. Initially, his appeal was placed on our excessive sentencing calendar. However, with the State's consent, we granted his request to transfer the matter to our plenary calendar.

II

Before us, M.P. contends public disclosure causes him specific and extraordinary harm by "permanently associat[ing]" his name "with one poor decision" for which he will "be judged by for the rest of his life." To the extent this argument contradicts K.B., he urges us to part ways with K.B. because the Internet now distributes information further, faster, and more permanently than was possible in 1997, when K.B. was decided.[4] To resolve these contentions, we briefly overview the statutory and case law relevant to the public's access to juvenile delinquency proceedings.

Court records from juvenile delinquency proceedings are automatically sealed. N.J.S.A. 2A:4A-60(a) ("strictly safeguard[ing]" these records "from public inspection"); see also R. 1:38-3(d)(5) (excluding "[j]uvenile delinquency records" from public access). However, the sealing statute allows certain third parties to access "these otherwise confidential records," State in the Int. of H.N., 267 N.J. Super. 596, 598-99 (App. Div. 1993), or specific

---

[4] We have not considered the State's arguments that the requested orders were moot and unconstitutional restrictions of press freedom, as the trial court did not address those issues. Gac v. Gac, 186 N.J. 535, 547 (2006).

information they contain under exceptional conditions, <u>State in the Int. of D.A.</u>, 385 N.J. Super. 411, 416-17 (App. Div. 2006).

This appeal involves one of those exceptions, which under N.J.S.A. 2A:4A-60(f) provides:

> <u>Information as to the identity of a juvenile adjudicated delinquent</u>, the offense, the adjudication and the disposition <u>shall be disclosed to the public</u> where the offense for which the juvenile has been adjudicated delinquent if committed by an adult, would constitute a crime of the first, second or third degree, or aggravated assault, destruction or damage to property to an extent of more than $500.00, <u>unless upon application at the time of disposition the juvenile demonstrates a substantial likelihood that specific and extraordinary harm would result from such disclosure in the specific case</u>. Where the court finds that disclosure would be harmful to the juvenile, the reasons therefor shall be stated on the record.
>
> [(Emphasis added).]

The statute's use of "shall" indicates public disclosure is mandated, which courts cannot prevent unless the juvenile proactively satisfies the statutory criteria. <u>D.A.</u>, 385 N.J. Super. at 416-17; <u>see</u> <u>State in the Int. of N.P.</u>, 453 N.J. Super. 480, 494 (App. Div. 2018) (noting "shall" signals a mandatory result).

Public disclosure balances two goals of our juvenile justice system, ensuring "the public's right to be informed" and aiding juvenile offenders' "prospects of rehabilitation" by protecting their confidentiality. <u>K.B.</u>, 304 N.J. Super. at 631. Our Code of Juvenile Justice, N.J.S.A. 2A:4A-20 to -48, seeks

"to effectuate" both objectives by substituting "certain statutory consequences of criminal behavior" with "rehabilitation" and "sanctions designed to promote accountability and protect the public."  N.J.S.A. 2A:4A-21(b).

Juvenile courts historically promoted confidentiality to prevent juveniles' delinquent status from "influencing the[ir] thinking and behavior" or that of anyone "who c[a]me into contact with [them]" later in life.  State v. Allen, 70 N.J. 474, 482 n.1 (1976) (citation omitted).  "By the late 1960s, however," critics of juvenile court systems called for greater emphasis on "protection of the community" as juvenile courts' "guiding consideration."  In re Registrant J.G., 169 N.J. 304, 322-23 (2001) (quoting McKeiver v. Pennsylvania, 403 U.S. 528, 546 n.6 (1971)).  This view gained momentum in the 1970s as "juvenile crime increased significantly," see Robert R. Belair, SEARCH Grp., Inc., Criminal Justice Information Policy:  Privacy and Juvenile Justice Records 16 (1982), and nationwide "[p]ublic concern about unrehabilitated juvenile offenders" prompted states to reexamine their juvenile justice policies, State v. R.G.D., 108 N.J. 1, 7-8 (1987).  New Jersey followed suit.  J.G., 169 N.J. at 323.

In 1977, our Supreme Court's Juvenile Justice Task Force called for mandatory public "disclosure of the names of juveniles involved in serious offenses."  State in the Int. of B.C.L., 82 N.J. 362, 375 (1980) (citing Juv. Just.

7

Task Force, <u>Confidentiality of Juvenile Court Proceedings: Report of the Task Force on Juvenile Justice</u>, 100 <u>N.J.L.J.</u> 65, 74 (1977)). The Legislature "tempered" this suggestion in favor of "discretionary disclosure," <u>ibid.</u>, when it enacted N.J.S.A. 2A:4-65 later that year, <u>L.</u> 1977, <u>c.</u> 255, § 1. The statute provided in pertinent part:

> At the time of charge, adjudication or disposition, information as to the identity of a juvenile [fourteen] years of age or older adjudicated delinquent, the offense, the adjudication and the disposition <u>may be disclosed to the public</u> where the offense for which the juvenile has been adjudicated delinquent involved violence to the person or, if committed by an adult, would constitute a high misdemeanor, murder, manslaughter, destruction or damage to property to an extent of [$500] or more, or the manufacture or distribution of a narcotic drug, <u>unless upon application at the time of disposition and for good cause shown</u>, or upon its own motion, the court orders the withholding from public dissemination of all or a portion of such information on the grounds that public disclosure would not serve the best interests of the juvenile and the public.
>
> [N.J.S.A. 2A:4-65(c) (1983) (emphasis added).]

Our Supreme Court interpreted the phrase "good cause" to mean "a substantial likelihood of specific harm." <u>B.C.L.</u>, 82 N.J. at 377. The Court concluded "specific harm" excluded consequences that "could apply with equal force to the overwhelming majority of juvenile offenders." <u>Ibid.</u> The Court also pronounced public disclosure as "the general rule" in the absence of good

cause.  Id. at 375.  The Court discerned the Legislature struck "a balance of policies in favor of disclosure" and did not wish for "the assistance which absolute secrecy might provide to [the juvenile's] rehabilitation" to come "at the expense of the public's right to know" the juvenile court system "adequately" kept the public safe.  Id. at 371, 376, 378.

In 1982, N.J.S.A. 2A:4-65 was repealed, L. 1982, c. 77, § 33, and the Legislature enacted N.J.S.A. 2A:4A-60 in its place, L. 1982, c. 79, § 1.  The new statute incorporated B.C.L.'s holding into its nondisclosure provision, which presumed a juvenile's identity, offense, adjudication, and disposition "shall be disclosed to the public" unless the juvenile showed "a substantial likelihood that specific harm would result from such disclosure."  N.J.S.A. 2A:4A-60(d) (1994).  A further amendment, L. 1994, c. 56, § 1, produced the current standard by removing the presumption of disclosure, State in the Int. of B.G., 289 N.J. Super. 361, 371 (App. Div. 1996), but adding the words "extraordinary" and "in the specific case" to the statute.

When K.B. was decided three years later, we applied B.C.L.'s interpretation of the "earlier [statute] bearing upon the [same] subject matter" to conclude the current statute still requires "significant detriments flowing to the individual that are both sufficiently grave and person- and situation-particular, i.e., not shared by juvenile defendants in general."  K.B., 304 N.J.

Super. at 634. The K.B. trial court held social stigma, loss of self-esteem, isolation, and risk of self-harm were neither specific nor extraordinary because most juveniles would suffer these foreseeable consequences of being adjudicated delinquent. Id. at 633. It gave several examples of sufficiently specific harm: a juvenile "lives in a minority neighborhood" and is adjudicated delinquent for "writ[ing] racist remarks all over [the] neighborhood"; or a youth who "is going to run away from home" and "commit suicide" if the court "release[s] [their] name." Id. at 632. We affirmed the trial court's opinion and acknowledged the current statute heavily favors public disclosure. Id. at 631, 634; see also Digit. First Media v. Ewing Twp., 462 N.J. Super. 389, 395 (App. Div. 2020).

Considering the aforementioned guidelines, we re-examine K.B.'s explanation of "person- and situation-particular" harm. See 304 N.J. Super. at 634. To aid our analysis, we find two Family Part decisions persuasive in interpreting statutory provisions regarding access to juvenile proceedings.

In State in the Interest of K.P., the trial court applied K.B.'s explanation of specific harm to evaluate the victim's opposition to a newspaper's request for permission to attend her juvenile attacker's adjudication proceedings. K.P., 311 N.J. Super. 123, 128, 144, 149 (Ch. Div. 1997). The court determined that, according to N.J.S.A. 2A:4A-60(i), preventing specific harm to the victim

10

fell within its discretionary "authority to limit and control the [media's] attendance [at the hearings] in any manner and to the extent it deem[ed] appropriate." Id. at 125 (quoting N.J.S.A. 2A:4A-60(i) (2002)).[5] The court accordingly denied the newspaper access, finding press coverage would trigger the victim's acute post-traumatic stress disorder (PTSD) and increase her risk of developing chronic PTSD. Id. at 147-48. The court further found "the entire community" knew about the case and would recognize the victim if the newspaper's coverage referenced her. Id. at 148.

In State in the Interest of B.J.W., the trial court, applying N.J.S.A. 2A:4A-60(a), excluded reporters after it found the media's presence would lead to "boldly-headlined newspaper accounts" revealing previously "confidential psychological and psychiatric information" about the juvenile and her immediate family, including the parent and sibling for whose murders she was charged. 250 N.J. Super. 619, 620, 623-25 (Ch. Div. 1991). At the time, N.J.S.A. 2A:4A-60(a) provided: "Social, medical, psychological, legal and other records of the court and probation department, and records of law enforcement agencies, pertaining to juveniles charged as a delinquent or found to be part of a juvenile-family crisis, shall be strictly safeguarded from public

---

[5] The statutory provision at issue in K.P. has since been renumbered N.J.S.A. 2A:4A-60(i)(1). L. 2001, c. 407, § 1. The renumbering did not alter the pertinent language.

11

inspection." The court determined, due to the unique circumstances of the juvenile's offense, the media's presence would interfere with her ongoing mental health treatment and harm her efforts to heal relationships with her surviving parent and sibling. Id. at 623-25.

### III

Applying the above noted law, we conclude the trial court properly exercised its discretion when it denied M.P. relief. See B.C.L., 82 N.J. at 379 (equating a trial court's discretion to permit public disclosure of a juvenile's delinquent adjudication with the court's discretion to sentence a defendant). Although certain facts underlying M.P.'s offense may be unique to him—taking a handgun to school—all juveniles adjudicated delinquent face possible rejection by colleges or employers who discover their delinquency. See id. at 377-78 (holding "the seriousness of the offense alone" may warrant waiver of a juvenile court's jurisdiction over a serious offender, which reflects a "similar" policy basis as public disclosure of the offender's identity and adjudication).

We see no reason to reconsider K.B. The trial court correctly discerned N.J.S.A. 2A:4A-60(f)'s requirement of specific harm "inten[ded] to strengthen" disclosure requirements. We are not oblivious to the exponential growth and influence of the Internet since K.B. In 2009, we recognized that information now spreads "in a moment's time" online. Stengart v. Loving Care Agency,

Inc., 408 N.J. Super. 54, 71 (App. Div. 2009).  And just four years ago, we acknowledged "there is no doubt society's reliance on the Internet for news, information, social contact, and entertainment has increased tremendously due to its increased ease of access, speed, efficiency, and creative use."  State v. R.K., 463 N.J. Super. 386, 417 (2020).  And it's fair to say, the Internet's influence has now expanded further.  See, e.g., Martin v. Thi E-Commerce, LLC, 313 Cal. Rptr. 3d 488, 508 (Ct. App. 2023) (recognizing "an ever-growing presence of new exclusively Internet-based goods and services" in multiple industries); accord In re Registrant B.B., 472 N.J. Super. 612, 626 (App. Div. 2022) (acknowledging "the difficulty in retracting information that has been published on the Internet").

Nevertheless, M.P. has made no showing that colleges and employers were unable, in 1997, to inquire into an applicant's juvenile delinquency adjudications and take them into consideration.  The fact that the Internet may shine a brighter light on juvenile delinquency does not affect our interpretation of N.J.S.A. 2A:4A-60(f) and application of K.B.  Until the Legislature amends the statute, a juvenile adjudicated delinquent must navigate the consequences of their identity and history being permanently available and accessible online and through more traditional means.  M.P. has not shown that the harms in the MCPO's disclosure of his name are specific to him by exposing him to

13

physical harm or impacting his mental health.  See K.B., 304 N.J. Super. at 632-33; K.P., 311 N.J. Super. at 125, 147-48; B.J.W., 250 N.J. Super. at 623-25.  Our juvenile justice system has consistently weighed the policy of "aiding and rehabilitating juvenile[]" offenders against a strong desire to inform the public about serious adjudications.  See State in the Int. of C.V., 201 N.J. 281, 285 (2010).  Yet, this balancing act is a legislative prerogative, which based on the record before us, does not invoke a constitutional issue warranting judicial intervention.  See In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 24 (2020).

Given that M.P. did not demonstrate specific harm, we need not address whether the harm was extraordinary or substantially likely to occur.  We also need not address the fact that M.P. did not seek relief before the disclosure due to our conclusion the trial court did not misinterpret N.J.S.A. 2A:4A-60(f) and K.B. and thus did not abuse its discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0134-22